ZACHARY, Judge.
 

 *665
 
 Johnny Darnell Mobley (defendant) appeals from a judgment entered upon his convictions for trafficking in marijuana by possession and transportation, and for having attained the status of an habitual
 
 *666
 
 felon. On appeal defendant argues that the trial court erred by failing to appoint an expert to conduct an investigation into defendant's competence to proceed to trial, and by denying defendant's motion to dismiss the charges against him. After careful consideration of defendant's arguments in light of the record and the applicable law, we conclude that, on the facts of this case, the trial court erred by failing to appoint an expert to investigate defendant's competence to stand trial. Accordingly, we reverse and remand without reaching the issue of the sufficiency of the evidence to support defendant's convictions.
 

 I. Factual and Procedural Background
 

 On 29 January 2015, defendant was arrested on charges of trafficking in more than ten but fewer than 50 pounds of marijuana by possession and by transportation, in violation of
 
 N.C. Gen. Stat. § 90-95
 
 (h)(1) (2015). Counsel was appointed to represent defendant on 30 January 2015. Defendant was indicted for these offenses on 2 March 2015, and was indicted on 5 October 2015 for having attained the status of an habitual felon. The charges against defendant came on for trial at the 10 February 2016 criminal session of Gaston County Superior Court. Prior to the start of trial, defendant's counsel expressed concern about defendant's having fallen asleep in the courtroom. The trial court conducted a discussion with defendant and counsel, which is described in detail below, and then ruled that defendant was competent to proceed to trial.
 

 The evidence presented by the State at trial tended to show the following: On 28 January 2015, Postal Inspector Justin Crooks inspected a package at the U.S. Post Office in Mount Holly, North Carolina. The package gave off an odor of marijuana; accordingly, he obtained assistance from a Charlotte-Mecklenburg Police Detective who worked with a dog that is trained to identify narcotics. After the dog indicated that the suspicious package contained narcotics, Inspector Crooks obtained a federal search warrant to inspect the contents of the package. Inside the package were two bundles of green vegetable matter weighing over 23 pounds. The contents appeared to be marijuana. This was later confirmed by forensic testing and the parties do not dispute that the package in fact contained marijuana.
 

 After Inspector Crooks examined the contents of the package, he contacted Officer E. Kyle Yancey of the Gaston County Police Department, who arranged for a controlled delivery of the package. The controlled delivery took place on 29 January 2015. Postal Inspector Mark Heath drove a postal service vehicle and wore a mail carrier's uniform. When Inspector Heath arrived at the location to which the package was
 
 *667
 
 addressed, he parked at the curb and got out of the postal service vehicle with the package. As Inspector Heath walked toward the house, he was met by defendant, who accepted the package and signed a postal form acknowledging delivery of the package. Upon Inspector Heath's return to the postal service vehicle, he saw defendant "placing the package into the cargo area of the Ford Explorer that was parked there in the driveway." Inspector Heath radioed law enforcement officers who were in the area and informed them that defendant had accepted the package before placing it a vehicle and driving away. A few minutes later the officers stopped defendant's vehicle. Defendant was arrested and charged with trafficking in marijuana by possession and transportation.
 

 On 11 February 2016, the jury returned verdicts finding defendant guilty of trafficking
 
 *439
 
 in marijuana by possession and by transportation. Defendant entered a plea of guilty to having the status of an habitual felon. The trial court consolidated the offenses for purposes of sentencing, and sentenced defendant to 60 to 84 months' imprisonment. Defendant gave notice of appeal in open court.
 

 II. Competency to Proceed
 

 N.C. Gen. Stat. § 15A-1001(a) (2015) provides that:
 

 No person may be tried, convicted, sentenced, or punished for a crime when by reason of mental illness or defect he is unable to understand the nature and object of the proceedings against him, to comprehend his own situation in reference to the proceedings, or to assist in his defense in a rational or reasonable manner. This condition is hereinafter referred to as "incapacity to proceed."
 

 "[This] statute provides three separate tests in the disjunctive. If a defendant is deficient under any of these tests he or she does not have the capacity to proceed."
 
 State v. Shytle
 
 ,
 
 323 N.C. 684
 
 , 688,
 
 374 S.E.2d 573
 
 , 575 (1989) (citations omitted). "The test of a defendant's mental capacity to stand trial is whether he has, at the time of trial, the capacity to comprehend his position, to understand the nature and object of the proceedings against him, to conduct his defense in a rational manner, and to cooperate with his counsel to the end that any available defense may be interposed."
 
 State v. Cooper
 
 ,
 
 286 N.C. 549
 
 , 565,
 
 213 S.E.2d 305
 
 , 316 (1975) (citations omitted). In determining whether a defendant has the capacity to proceed, the fact that a defendant has been diagnosed with a mental illness does not, standing alone, require a finding that the defendant is incompetent to stand trial. In
 
 Cooper
 
 , our Supreme Court held that:
 

 *668
 
 In this instance, there was ample expert medical testimony to support the trial court's finding that the defendant was competent to plead to the charges against him and to stand trial. The fact that the defendant had to be given medication periodically during the trial, in order to prevent exacerbation of his mental illness by the tensions of the courtroom, does not require a finding that he was not competent to stand trial when, as here, the undisputed medical testimony is that the medication did not have the effect of dulling his mind and that the specified dosage was adequate to keep his mental illness in remission.
 

 Cooper
 
 ,
 
 286 N.C. at 566
 
 ,
 
 213 S.E.2d at 317
 
 .
 

 "[A] trial judge is required to hold a competency hearing when there is a
 
 bona fide
 
 doubt as to the defendant's competency even absent a request."
 
 State v. Staten
 
 ,
 
 172 N.C.App. 673
 
 , 678,
 
 616 S.E.2d 650
 
 , 654-55,
 
 disc. review denied
 
 ,
 
 360 N.C. 180
 
 ,
 
 626 S.E.2d 838
 
 (2005). "A trial court has a constitutional duty to institute,
 
 sua sponte
 
 , a competency hearing if there is substantial evidence before the court indicating that the accused may be mentally incompetent."
 
 State v. Badgett
 
 ,
 
 361 N.C. 234
 
 , 259,
 
 644 S.E.2d 206
 
 , 221 (2007) (internal quotation marks and citations omitted).
 

 III. Defendant's Inability to Remain Awake During Trial
 

 In the present case, defendant's trial began on the morning of Wednesday, 10 February 2016. Prior to the introduction of evidence, the trial court conducted pretrial proceedings lasting approximately three hours, including jury selection and a hearing on defendant's motion to suppress evidence. Before the trial court took a lunch recess, defendant's trial counsel asked to bring a matter to the trial court's attention. Following a brief unrecorded bench conference, the trial court asked defendant to stand, and conducted a colloquy with defendant:
 

 THE COURT: Your lawyer has raised some concerns with the Court about your attention this morning. Are you able to hear and understand me?
 

 THE DEFENDANT: Not really.
 

 THE COURT: Is it because you are having difficulty hearing, you have a hearing problem, or are your thoughts somewhere else?
 

 THE DEFENDANT: Really I don't even know. I think my thoughts are somewhere else.
 

 *669
 
 THE COURT: All right. Are you under the influence of anything, alcohol or drugs?
 

 *440
 
 THE DEFENDANT: My medication. That's it.
 

 THE COURT: All right. What sort of medication do you take?
 

 THE DEFENDANT: A bag full.
 

 THE COURT: What sort of conditions do the medications treat?
 

 THE DEFENDANT: My heart and my mental illness.
 

 THE COURT: Your heart, and you have a mental illness?
 

 THE DEFENDANT: Yes.
 

 THE COURT: And how long have you had your heart condition?
 

 THE DEFENDANT: Probably since 2007.
 

 THE COURT: And have you been diagnosed with some sort of mental illness?
 

 THE DEFENDANT: Yes.
 

 THE COURT: What is that?
 

 THE DEFENDANT: Bipolar schizophrenic.
 

 THE COURT: How long ago were you diagnosed?
 

 THE DEFENDANT: Probably about four years.
 

 THE COURT: And do you take medication for both of those conditions, your heart and your mental illness?
 

 THE DEFENDANT: Yes, ma'am.
 

 THE COURT: How long have you been taking your current medications?
 

 THE DEFENDANT: Since then; about four years.
 

 THE COURT: And how do those medications affect you? Are there any side effects?
 

 THE DEFENDANT: Yeah. I sleep less, and like memory loss. Stuff like that.
 

 *670
 
 THE COURT: How long have you experienced those side effects?
 

 THE DEFENDANT: Probably since that time.
 

 THE COURT: And how have you managed those side effects for the last four years?
 

 THE DEFENDANT: Just go with the flow, I guess. Just whatever happens.
 

 Defendant told the trial court that despite having a full night's sleep the night before, he was having difficulty following the proceedings in court. The trial court conducted an additional inquiry into defendant's comprehension of the legal proceedings. Defendant's behavior was respectful and appropriate, and his answers to the court's questions were not irrational or delusional. Defendant demonstrated a general, if limited, understanding of the charges against him and of the prior history of the case. For example, he knew that he was charged with trafficking in marijuana and being an habitual felon, and that the significance of the habitual felon charge was that it exposed him to a longer prison sentence. The trial court asked defendant about the medications he took, and defendant agreed to allow the court to inspect a bag defendant had brought to court that contained his medications. After reviewing the contents of the bag, the trial court discussed the medications with defendant:
 

 THE COURT: All right. Mr. Mobley, I have not reached into the bag but I just counted the bottles. And there appear to be twenty-five plus bottles of medication in there. Do you take all of those every day?
 

 THE DEFENDANT: Yes; twice a day. I have a list of them right here.
 

 THE COURT: And have you shared that list of medications with your lawyer before today?
 

 THE DEFENDANT: No.
 

 THE COURT: And when is the last time you have seen a doctor for your heart condition?
 

 THE DEFENDANT: I go Friday. They gonna put another pacemaker in and another stint.
 

 *671
 
 THE COURT: You go a day after tomorrow?
 

 THE DEFENDANT: Yes, ma'am.
 

 Defendant also told the court that he was scheduled to meet with a doctor regarding his mental illness in about six weeks. The trial court then asked defendant's counsel for further input. Defendant's trial counsel stated that she was appointed to represent defendant shortly after his arrest. Defense counsel met with defendant several times to
 
 *441
 
 discuss the case, and described defendant as having been "coherent and able to discuss his case" with counsel. Defendant's attorney expressed concern, however, about defendant's inability to remain awake during the pretrial proceedings:
 

 DEFENSE COUNSEL: It was only then during the jury selection that he was-I noticed him snoring, or heard him snoring, looked over and he was asleep on more than one occasion. I attempted to explain the severity of his case and the importance of the jury and what they may think of him, simply his demeanor. And to no avail. It continued to keep happening, which of course is alarming to me and certainly to the State, and obviously to this Court....
 

 THE COURT: So is it my understanding-do I hear you saying that you have seen some noticeable deterioration in his ability to communicate and participate in his defense today that you have not seen before today?
 

 DEFENSE COUNSEL: I have-well, first of all, I will say this. I have not been seated beside Mr. Mobley for three hours straight. So that being said, I'm not sure I would say it's a deterioration, I will say that I have never seen him be this lethargic. And I'm not-I can't speak to what's causing it, but again, I've never been in his-sitting beside of him for three hours.
 

 THE COURT: Have you noticed some deterioration today in the three-hour window that you have been-has it been consistent all day or have you seen his attention span decline today?
 

 DEFENSE COUNSEL: No, I think his attention span has been waning. He did appear a little more engaged-well, that's kind of hard for me to say too, because during the testimony I was more focused on the officers instead of
 
 *672
 
 him. And he did have some things to say to me after the motion. I guess that's hard for me to say. Because what really drew my attention to it was the snoring.
 

 THE COURT: All right.
 

 DEFENSE COUNSEL: And then I noticed it repeatedly. And I noticed the jurors, several of them appeared to be noticing it as well. When I spoke to him first thing this morning, no, I did not at all get the impression that he was in any way impaired by anything. It's just the sleeping that has me concerned.
 

 At that point, the trial judge told the parties that she would consider the matter during the lunch recess. Following the break for lunch, the trial court addressed counsel and defendant:
 

 THE COURT: Okay.... [B]efore we broke for lunch, defense counsel raised some concerns about the defendant, Mr. Mobley. And, Mr. Mobley, we were having a discussion right before lunch about what you understood to be the charges against you and your physical condition and so forth. Do you remember that?
 

 THE DEFENDANT: Yeah; a little bit.
 

 Thereafter, the trial court reviewed with defendant the charges against him and the possible sentences he might receive if convicted. Defendant indicated that he understood these circumstances, although he had little memory of meeting with counsel prior to trial. The court then returned to the subject of defendant's sleeping in court:
 

 THE COURT: Now, Mr. Mobley, your lawyer brought to my attention that you appeared to be sleeping, she heard you snoring, I believe.
 

 THE DEFENDANT: I'm tired right now. I was going to ask can I sit back down.
 

 In response, the trial court explained to defendant that he was charged with serious offenses for which he might receive a significant prison sentence and that the jury would be assessing his demeanor:
 

 THE COURT: ... But whether or not you testify the jury can see you. They can see whether or not you are asleep. And so it would be in your best interest to stay awake
 
 *673
 
 and give the jury the very best impression. Do you understand that?
 

 THE DEFENDANT: Yes. But right now I'm just tired and beat. This medicine, I just won't take it tomorrow, or whatever.
 

 THE COURT: I'm sorry. Say that again.
 

 THE DEFENDANT: My medicine, I just won't take it tomorrow, or something.
 

 *442
 
 THE COURT: Well, what has your doctor told you about taking your medicine, and whether you should-
 

 THE DEFENDANT: Take it every day.
 

 THE COURT: Are you able to reach your doctor on the telephone?
 

 THE DEFENDANT: I don't know. I guess.
 

 THE COURT: How many doctors do you have?
 

 THE DEFENDANT: Seven.
 

 THE COURT: Seven doctors? And what have they told you would happen if you stopped taking your medication?
 

 THE DEFENDANT: Possibility of like dying.
 

 THE COURT: And so do you think it is wise to stop taking your medication?
 

 THE DEFENDANT: No.
 

 THE COURT: Do you work normally, Mr. Mobley?
 

 THE DEFENDANT: No, ma'am.
 

 THE COURT: Are you on disability?
 

 THE DEFENDANT: No. I just applied for it. I had a aortic valve dissection, electronic.
 

 THE COURT: And how long were you in the hospital?
 

 THE DEFENDANT: About seven months.
 

 THE COURT: How long have you been out of the hospital?
 

 THE DEFENDANT: Now probably about eight months.
 

 *674
 
 ...
 

 THE COURT: And what do you do during the day?
 

 THE DEFENDANT: Just stay at home.
 

 THE COURT: Do you sleep most of the day?
 

 THE DEFENDANT: Yeah.
 

 THE COURT: All right. Based upon the Court's inquiry, the Court does not have any concerns about Mr. Mobley's competency to proceed. He appears to understand the charges against him and the maximum possible penalties of those charges if he is convicted of the same. He also appears to understand the importance of his appearance to the jury. So the Court is prepared to proceed.
 

 At this point, several witnesses testified for the State. Before the trial court recessed court for an afternoon break, defendant's counsel informed the court that defendant had continued to sleep during trial:
 

 THE COURT: Counsel, anything before we break?
 

 PROSECUTOR: I just would ask that ... [the witnesses] be released off their subpoenas, Your Honor.
 

 THE COURT: Any objection?
 

 DEFENSE COUNSEL: No, Your Honor. And I would just state for the record that I have kicked and I have hit Mr. Mobley three times during the course of this afternoon, and to no avail.
 

 THE COURT: So noted.
 

 After the jury found defendant guilty of two counts of trafficking in marijuana, defendant agreed to plead guilty to having the status of an habitual felon. During the trial court's colloquy with defendant regarding his plea of guilty, the subject of defendant's mental condition was raised again:
 

 THE COURT: Are you now under the influence of alcohol, drugs, narcotics, medicines, pills, or any other substance?
 

 THE DEFENDANT: Just medicine.
 

 THE COURT: That we talked about earlier at the outset?
 

 THE DEFENDANT: Yes, ma'am.
 

 *675
 
 THE COURT: Does that affect your ability to understand what's going on today?
 

 THE DEFENDANT: Sometimes. I'm just ready to get this over with.
 

 THE COURT: Are you thinking clearly today?
 

 THE DEFENDANT: I hope so. Let's-I'm just ready to get it over with.
 

 THE COURT: All right. Sir, I understand that you're ready to get it over with, but are you understanding what is going on today?
 

 THE DEFENDANT: Yes.
 

 *443
 

 IV. Discussion
 

 As discussed above, a "trial court has a constitutional duty to institute,
 
 sua sponte
 
 , a competency hearing if there is substantial evidence before the court indicating that the accused may be mentally incompetent."
 
 Badgett
 
 ,
 
 361 N.C. at 259
 
 ,
 
 644 S.E.2d at 221
 
 . A criminal defendant is incompetent to proceed to trial if he is "unable to understand the nature and object of the proceedings against him, to comprehend his own situation in reference to the proceedings, or to assist in his defense in a rational or reasonable manner." N.C. Gen. Stat. § 15A-1001(a). "[A] defendant's competency to stand trial is not necessarily static, but can change over even brief periods of time."
 
 State v. Whitted
 
 ,
 
 209 N.C.App. 522
 
 , 528-29,
 
 705 S.E.2d 787
 
 , 792 (2011) (citing
 
 State v. McRae
 
 ,
 
 139 N.C.App. 387
 
 ,
 
 533 S.E.2d 557
 
 (2000) ). For this reason, a defendant's competency is assessed "at the time of trial."
 
 Cooper
 
 ,
 
 286 N.C. at 565
 
 ,
 
 213 S.E.2d at 316
 
 .
 

 "Where a defendant demonstrates or where matters before the trial court indicate that there is a significant possibility that a defendant is incompetent to proceed with trial, the trial court must appoint an expert or experts to inquire into the defendant's mental health[.]"
 
 State v. Grooms
 
 ,
 
 353 N.C. 50
 
 , 78,
 
 540 S.E.2d 713
 
 , 730 (2000). In the present case, we conclude that the evidence indicated that defendant was able to "understand the nature and object of the proceedings against him, [and] to comprehend his own situation in reference to the proceedings[.]" § 15A-1001(a). We conclude, however, that "matters before the trial court" indicated more than a "significant possibility" that defendant, who suffered from serious physical and mental conditions, was unable to remain awake and therefore was unable to consult with his attorney
 
 *676
 
 or participate in his defense. This evidence raised a "significant possibility" that at the time of trial defendant was incompetent.
 

 We have reached this conclusion based on the specific facts and circumstances of this case, in which there was evidence before the trial court suggesting that:
 

 1. Defendant had a serious heart condition, for which he had been hospitalized for several months.
 

 2. Defendant had been diagnosed with bipolar schizophrenia, a major mental illness.
 

 3. Defendant took 25 different medications twice daily.
 

 4. Defendant's medications had psychoactive side-effects.
 

 5. Defendant was unable to remain awake in the courtroom, even when kicked or prodded by counsel.
 

 We hold that these circumstances required the trial court to appoint an expert in order to ascertain whether defendant was competent to proceed to trial. We also note that no evidence or arguments were presented in court to discredit defendant's contentions about his physical and mental condition, and that the trial court did not make any findings indicating that the court had doubts about defendant's credibility.
 

 "[A] defendant does not have to be at the highest stage of mental alertness to be competent to be tried. So long as a defendant can confer with his or her attorney ... the defendant is able to assist his or her defense in a rational manner."
 
 Shytle
 
 ,
 
 323 N.C. at 689
 
 ,
 
 374 S.E.2d at 575
 
 . However, as the United States Supreme Court held more than forty years ago:
 

 It has long been accepted that a person whose mental condition is such that he lacks the capacity to ... consult with counsel, and to assist in preparing his defense may not be subjected to a trial.... Some have viewed the common-law prohibition as a by-product of the ban against trials in absentia; the mentally incompetent defendant, though physically present in the courtroom, is in reality afforded no opportunity to defend himself.
 

 Drope v. Missouri
 
 ,
 
 420 U.S. 162
 
 , 171,
 
 95 S.Ct. 896
 
 , 903,
 
 43 L.Ed.2d 103
 
 , 113 (1975) (internal quotation and citations omitted). It is clear that a defendant who is incapable of remaining awake is, by definition, unable to "consult with counsel, and to assist in preparing his defense."
 

 *444
 

 *677
 
 We emphasize that our conclusion is based upon the application of long-standing legal principles to the unusual facts of this case, and should not be interpreted as articulating a new rule or standard. We do not hold that a trial court is required to order a competency evaluation in every case in which a criminal defendant is drowsy or suffers from a mental or physical illness. However, the facts of the present case raise significant questions about defendant's competence, and these questions cannot be answered by reference to the record evidence. Defendant represented that he suffered from serious physical and mental conditions, but defendant's medical records were not in evidence. It is possible that defendant's overwhelming drowsiness simply required an adjustment in medication dosage or treatment protocol. Defendant's condition may have been transient, and may have been either more or less serious than he represented. As a result, our holding is not based on any opinion or speculation as to the likely result of an investigation into defendant's competence or any other factual issue in this case. Nonetheless, when the trial court was faced with a defendant who ostensibly suffered from serious mental and physical conditions and could not stay awake during his trial on serious felony charges, the trial court was constitutionally required to appoint an expert to investigate the issue of defendant's capacity to proceed.
 

 For the reasons discussed above, we conclude that the trial court erred by failing to determine whether, at the time of trial, defendant was competent to stand trial and that defendant is entitled to a new trial.
 

 REVERSED.
 

 Judges CALABRIA and INMAN concur.